IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GONE GB LTD. and
ORI GERST,

      Plaintiffs,

v.

INTEL SERVICES DIVISION, LLC and
INTEL CORPORATION,

      Defendants.

Civil Action No. 21-978-RGA

## MEMORANDUM OPINION

David E. Wilks, Adam J. Waskie, WILKS LAW, LLC, Wilmington, DE; David Leichtman, Devin Newman, LEICHTMAN LAW PLLC, New York, NY,

    Attorneys for Plaintiffs.

Matthew E. Fischer, Jonathan A. Choa, Jacqueline A. Rogers, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Vanessa Soriano Power, STOEL RIVES LLP, Seattle, WA; Samantha K. Sondag, STOEL RIVES LLP, Portland, OR,

    Attorneys for Defendants.

March 28, 2022

1

ANDREWS, UNITED STATES DISTRICT JUDGE:

Before me is Defendants ("Intel")'s motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (D.I. 14). The motion has been fully briefed and I have considered the parties' briefing. (D.I. 15, 18, 20).

## I. BACKGROUND

Plaintiffs Gone GB Ltd. and Ori Gersht filed a complaint in Delaware Superior Court on June 1, 2021. (D.I. 2 ¶ 1). The action was removed to this Court on July 1, 2021, based on the assertion that this Court had federal question jurisdiction. (*Id.* ¶ 6). Venue is proper pursuant to 28 U.S.C. § 1446(a), and this Court has federal question jurisdiction and supplemental jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367. (*Id.* at 6-8).

This action arises out of a failed collaborative partnership between Plaintiffs and Intel. Gersht is "a fine artist" who works "principally in photography and film." (D.I. 2-1 ¶ 9). Gone GB is a UK company partly owned by Gersht, "which is engaged in the business of the creation of visual and audio-visual artworks through its employment of various artisans." (*Id.* ¶ 3). Intel is a technology company and the largest semiconductor manufacturer in the world. (*Id.* ¶¶ 4-5). In 2016, Intel announced its purchase of Replay Technologies, a 3D-imaging company. (*Id.* ¶¶ 26-28). Replay developed a technology known as "freeD," "which is a 3D-imaging process used in volumetric imaging." (*Id.*). "Volumetric imaging is a technology that captures a three-dimensional location or a performance." (*Id.* ¶ 26). Replay's freeD technology "utilizes numerous cameras, arranged in a fashion to capture multiple angles of the subject," which "are stitched together in software to create a video that can be manipulated and rotated to display the action from any angle captured." (*Id.* ¶ 28).

Following Intel's acquisition of Replay, Intel established "Intel Studios," "to create the world's largest volumetric stage in Los Angeles, California with a 10,000 square-foot dome to capture actors and objects in volumetric 3D for production of high-end holographic content for Virtual Reality (VR) and Augmented Reality." (*Id.* ¶ 31). Intel Studios launched operations at the beginning of 2018 with the goal of developing "immersive media solutions including the capture, production and distribution of large-scale, end-to-end volumetric and Virtual Reality content." (*Id.* ¶ 32). Intel Studios employed "high speed 8k cameras that could be arranged in an array such that they could capture images moving in real time" and "vast computer power required to simultaneously capture footage of images and render that footage into 3D images." (*Id.* ¶¶ 34-35). Intel Studios "also employed proprietary software that was required to render the captured data into 3D images." (*Id.* ¶ 35).

Intel Studios "maintained a unique electronic production environment for the volumetric images created at the Intel Studio (the ['UEPE']) to process the volumetric images taken with the camera array at the studio." (*Id.* ¶ 41). Intel's UEPE "consisted of numerous computer servers, data storage devices, and software applications necessary to film, process, and edit the volumetric imaging data captured in the studio, as well as the computer servers, data storage devices, and software applications necessary for post-production volumetric imaging work . . . ." (*Id.* ¶ 42).

In 2018, Intel invited Gersht to "collaborate with Intel Studios on a project ['the Project'] to demonstrate the experiential power of Intel's [volumetric imaging] technology . . . ." (*Id.* ¶ 46). The goal of the Project was "to combine [Intel's] industry-leading volumetric video capture and processing capabilities with Mr. Gersht's creative vision to create the world's first volumetric artwork – a museum/gallery installation combining physical structural elements, text, music and a Virtual Reality (VR) experience using volumetric footage shot by Mr. Gersht on Intel Studios'

volumetric stage . . ." (*Id.*). "The results of the Project were to be co-owned by Mr. Gersht and Intel." (*Id.* ¶ 47). The Project was initially titled, "Man on A Wire," but, by the time of the termination of the partnership between Plaintiffs and Intel, was titled, "Letters and Towers." (*Id.* ¶ 49).

On April 1, 2019, "Ori Gersht, through Gone GB LTD" and Intel entered into a non-binding Memorandum of Understanding ("MOU") agreement pursuant to which the parties agreed to "explore a potential collaboration, which may include the creation of a digital audiovisual artistic work (the 'Work'), implementing the Artist's vision with the working title 'Man on a Wire' through Intel Studios' technology and capabilities . . . ." (D.I. 2-2 Ex. B at 1-3).

On June 1, 2019, Gone GB[1] and Intel entered into a "co-production agreement" (the "CPA"), which superseded the MOU and governed the terms of their partnership. (D.I. 2-1 ¶ 97). The CPA was signed "by Intel Services Division, LLC and Mr. Gersht's company, Gone GB." (*Id.*). Under Section 2.1 of the CPA, the parties agreed to "co-develop, co-produce, distribute, and exploit one or more Works as described in the relevant SOW [statement of work] and in accordance with the terms and conditions of this Agreement." (D.I. 2-1 Ex. D at 4). The CPA established, "Artist intends to provide all creative direction for the Work," and "Intel will be responsible for volumetric photography for the Work." (*Id.*). The CPA also provided, "Intel will provide its volumetric studio facilities and its personnel for use during scheduled volumetric photography, including without limitation the Technology necessary for capture, processing, and storage of volumetric content during the term of the SOW," but "Artist will not have access to cameras,

---

[1] Gersht signed the CPA on behalf of the "Artist," Gone GB. (D.I. 2-1 Ex. D at 15). The CPA states in Section 2.2, "Artist acknowledges and agrees that all participation in this Agreement [] will be by Ori Gersht personally on behalf of Gone GB LTD." (*Id.* at 4).

workstations, servers, network and networking equipment, or any other Intel Technology used for photography." (*Id.*). Section 13.2 of the CPA provides:

> **Complete Agreement**. This Agreement and any amendments contain the complete and exclusive agreement and understanding between the Parties concerning the subject matter of this Agreement, and supersede all prior and contemporaneous agreements, understandings, representations, warranties, and communications, oral or written, between the Parties relating to the same subject matter. Each Party agrees that in entering into this Agreement it has not relied on, and will not be entitled to rely on, any oral or written understandings, representations, warranties, or communications that are not expressly set forth in this Agreement. The express provisions of this Agreement will prevail over any different, conflicting, or additional provisions on any purchase order, acknowledgment, invoice, or other writing issued by either Party. If the provisions of this Agreement conflict with the provisions of any SOW, the conflict will be resolved in favor of the Agreement unless the SOW specifically identifies the conflicting provision of the Agreement."

(*Id.* at 12).

From November 18-20, 2019, Gersht, "with the participation of approximately sixty people, including seven performers" completed "the main shoot at the Intel Studios," which "was to be *the shoot* from which all the volumetric imaging data for the Project was to be obtained." (D.I. 2-1 ¶¶ 103-04). "Gersht and his artistic collaborators spent over five months preparing for the full shoot, followed by seven days in Los Angeles for the shoot." (*Id.* ¶ 103).

After the November 2019 shoot, Gersht "returned to London to begin work on producing the VR experience." (*Id.* ¶ 108). "Despite Mr. Gersht's numerous requests for access to the necessary software to allow him to work with the volumetric imaging data shot at the Studio in a VR software application, and Intel's obligations to deliver that access under both the MOU and the CPA, Intel failed to deliver this software . . . ." (*Id.* ¶ 109).

On September 23, 2020, Intel informed Gersht via letter "that Intel was shutting Intel Studios and terminating Gone GB's agreement with Intel." (*Id.* ¶ 119). "In the letter, Intel failed to inform Mr. Gersht that the studio had already been shut down and all of the necessary computers

5

storing the VOLA [volumetric human figures] software had already been dismantled and the software engineers had already been terminated or reassigned." (*Id.* ¶ 119). "Intel then informed Mr. Gersht that Mr. Gersht needed to provide Intel with sufficient computer storage devices to transfer the over 1,000 Terabytes of data including raw footage and a small amount of initial volumetric work that had been completed before Intel stopped work." (*Id.* ¶ 120).

Gersht "determined that it would cost him approximately $70,000 to secure sufficient hard drives to transfer the raw data" and ultimately "did not spend the $70,000 necessary to transfer the raw data." (*Id.* ¶¶ 123-24). Gersht "does not know what Intel has done with the raw data or whether there is a working version of the VOLA software available." (*Id.* ¶ 125). As a result, Gersht "was rendered incapable of making any use of the efforts he expended on the Project over the prior two years." (*Id.* ¶ 133). "The raw data files Intel has offered Mr. Gersht have absolutely no value to him on their own and will not enable Mr. Gersht to complete [the Project]," because the "files must first be rendered into high definition VOLA inserts which were then supposed to be processed using Intel's proprietary plug-ins supported by the team which developed Intel's technology," and, "[w]ithout the [UEPE] and the Intel technical team at his disposal to run the environment, Mr. Gersht cannot complete the VR Project." (*Id.* ¶ 136).

Plaintiffs bring ten counts against Intel arising out of the failed partnership. In Counts I and II, Plaintiffs allege Intel violated Sections 1030(a)(5)(A) and 1030(a)(5)(C), respectively, of the Computer Fraud and Abuse Act ("CFAA"). (*Id.* ¶¶ 143-49). In Count III, Plaintiffs allege Intel violated Section 935(2) of the analogous Delaware Misuse of Computer Information Act ("MCIA"). (*Id.* ¶¶ 150-55). In Count IV, Plaintiffs bring a claim of Estoppel and Promissory Estoppel based on "representations and promises" Intel made to Plaintiffs "upon which Plaintiffs relied to their extreme detriment." (*Id.* ¶¶ 156-59). In Count V, Plaintiffs bring a claim for breach

of contract. (*Id.* ¶¶160-66). Counts VI-X are for breach of the implied covenant of good faith and fair dealing, tortious interference with contract and prospective business relations, quantum meruit, conversion, and "restitution," respectively.

Intel seeks dismissal of all claims except Count V, breach of contract, for failure to state a claim. (D.I. 15 at 2-3).

I only consider the federal claims, as the parties appear to agree that there is otherwise no federal question jurisdiction and impliedly no good reason to exercise supplemental jurisdiction. (*See* D.I. 18 at 8 n.2 (Plaintiffs); D.I. 20 at 1 (Intel); D.I. 24 at 1 (Intel)).

## II. LEGAL STANDARD

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the complaint's factual allegations as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 555. The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Id.* ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (cleaned up)).

## III. DISCUSSION

In Counts I and II, Plaintiffs bring claims under Sections 1030(a)(5)(A) and (C) of the CFAA.

Section 1030(a)(5)(A) of the CFAA establishes liability against anyone who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(5)(A). The CFAA defines a "protected computer" as "a computer . . . which is used in or affecting interstate commerce or communication . . . ." 18 U.S.C. § 1030(e)(2)(B). The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Plaintiffs claim Intel's computers are "protected computers" within the meaning of the CFAA and that Intel violated this provision "[b]y decommissioning, destroying, and by issuing commands resulting in the [UEPE] being dismantled and thereby rendering impossible the ability of Plaintiffs to retrieve the images and the VOLA files within the [UEPE] on the protected computers . . . ." (D.I. 2-1 ¶ 145).

Section 1030(a)(5)(C) establishes liability against anyone who "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." 18 U.S.C. § 1030(a)(5)(C). Plaintiffs claim Intel violated this provision when it "intentionally accessed a protected computer and issued commands within the [UEPE], in a manner that breached its obligations to Plaintiffs by destroying files or rendering other files useless . . . ." (D.I. 2-1 ¶ 148).

The CFAA does not define "authorization" or "without authorization."

Intel argues that Plaintiffs' claims fail as a matter of law because (1) Plaintiffs "cannot plausibly allege that Intel's actions discontinuing development of the Work with respect to its own

8

computer servers, data storage devices, and software was 'without authorization' under the CFAA," and (2) Plaintiffs' claim under Section 1030(a)(5)(A) fails because Intel did not cause "damage" to a protected computer, as "Intel has not destroyed the data files it created to develop the Work." (D.I. 15 at 8).

Plaintiffs respond, "§1030(a)(5)(A) does not prohibit one from accessing a computer 'without authorization;' rather, it prohibits the intentional causing of damage without authorization," and, "While Intel had authorization to access its own computers, it did not have the right to damage the Gone GB co-owned data." (D.I. 18 at 4-5).

I agree with Intel that Plaintiffs have failed to state a claim under the CFAA. It is clear from the face of the CPA that Intel did not act "without authorization" within the meaning of the CFAA when it "decommission[ed] the computer servers, software, and storage capabilities necessary for completion of the Crucial VR Deliverables" and "stopped supporting its VOLA software, leaving only a 'read' version of the software available and no functioning machine that can run the process." (D.I. 2-1 ¶¶ 116-17).

The CPA represents "the complete and exclusive agreement understanding between the Parties," and "supersede[s] all prior and contemporaneous agreements, understandings, representations, warranties, and communications, oral or written, between the Parties relating to the same subject matter." (*Id.* Ex. D. at 12). Section 2.4 of the CPA expressly provides, "Intel is not obligated to provide Artist with decision-making authority over the volumetric photography process, and Artist will not have access to cameras, workstations, servers, network and networking equipment, or any other Intel Technology used for photography," and the CPA's SOW states, "All technology created and developed by Intel during the course of the Work will be solely owned by Intel." (*Id.* at 4, 18). "Technology" is defined in section 1.23 of the CPA as, "all know-how,

9

information, ideas, inventions, modifications, prototypes, tools, equipment, other tangible embodiments, and works of authorship, including without limitation specifications, software (including instantiated algorithms), databases, compilations, schematics, documentation, data, and presentations." (*Id.* at 3).

Under the express terms of the CPA, Intel retained sole ownership and control over the "protected computer," *i.e.*, the UEPE.[2] Intel therefore could not, as a matter of law, access the UEPE "without authorization," as required by § 1030(a)(5)(C), nor cause "damage" to the UEPE "without authorization," as required by § 1030(a)(5)(A). (D.I. 2-1 ¶ 42). The CFAA does not empower a plaintiff to bring a claim against a defendant for causing "damage" to its own computer; such an interpretation would be untenable. *See QVC, Inc. v. Resultly, LLC*, 159 F. Supp.3d 576, 595 (E.D. Pa. 2016) (holding, in the context of CFAA Section 1030(a)(5)(C), "those who have permission to access a computer for any purpose, such as employees, cannot act 'without authorization' unless and until their authorization to access the computer is specifically rescinded or revoked"); *QVC, Inc. v. Resultly, LLC*, 99 F. Supp.3d 525, 536 (E.D. Pa. 2015) (holding "if a plaintiff proceeds under Section 1030(a)(5)(A), it must show that the defendant intended to cause harm to *plaintiff's* computer through its access") (emphasis added).

Plaintiffs' citation to Intel's assurance in Section 2.4 of the CPA, "Intel will provide its volumetric studio facilities and its personnel for use during scheduled volumetric photography, including without limitation the Technology necessary for capture, processing, and storage of volumetric content during the term of the SOW," suggests that there may be a credible breach of

---

[2] Plaintiffs define the UEPE in their complaint as the "numerous computer servers, data storage devices, and software applications necessary to film, process, and edit the volumetric imaging data captured in the studio, as well as the computer servers, data storage devices, and software applications necessary for post-production volumetric imaging work . . . ." (D.I. 2-1 ¶ 42).

10

contract claim but does not save Plaintiffs' CFAA claims. (*Id.* Ex. D at 4). Intel's commitment to granting Plaintiffs temporary access to "its" UEPE does not change the fact that the UEPE belonged to Intel, not to Plaintiffs.

For these reasons, Intel's motion to dismiss the federal claims in Counts I, II, and III for failure to state a claim will be granted.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (D.I. 14) will be GRANTED.

The federal claims in Counts I and II are DISMISSED with prejudice.

With the dismissal of the two federal claims, there are still eight state law claims. The case is at its initial stages. There is no reason to exercise supplemental jurisdiction. Therefore, I exercise my discretion to dismiss the state law claims. *See DeAscensio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003) ("'It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right,'" and, "[w]here 'the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.'") (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

An appropriate order will issue.